IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (No. IV) | Consolidated Under MDL DOCKET NO. 875 |
| DIANNA K. LARSON, et al. | E.D. PA Civil Action No. 09-69123 |
| v. | Transferor Court District of Utah (Central) |
| BONDEX INTERNATIONAL, et al. | 08-cv-00333 |

## MEMORANDUM

M. FAITH ANGELL  
UNITED STATES MAGISTRATE JUDGE

December 9, 2010

Presently before this Court for decision are four motions for summary judgment filed by Defendants. For the reasons stated below, all four motions for summary judgment will be denied as follows: Defendant Bondex International's Motion for Summary Judgment will be denied without prejudice as this Defendant is in bankruptcy proceedings; Defendant Georgia-Pacific's Motion for Summary Judgment on Causation will be denied because Plaintiff's challenged expert testimony has been ruled admissible; and Defendants Georgia-Pacific and Union Carbide's motions for summary judgment on product identification will be denied on the merits.[1]

---

[1] This Memorandum will address the merits of the two motions for summary judgment on product identification which have been filed by Defendants Georgia-Pacific and Union Carbide. The issues raised in the remaining two motions have been resolved and/or are stayed and, therefore, will not be separately discussed.

## I. Background.

Plaintiff Dianna Larson was diagnosed with mesothelioma in 2006. Plaintiffs allege that the mesothelioma is the result of exposure to asbestos in joint compound products which Dianna Larson used in the 1970's when she and her first husband built two homes in Utah. Named Defendants are alleged to have manufactured, sold or distributed chrysotile-containing joint compound products.[2]

Plaintiffs allege that Dianna Larson and her first husband constructed the two homes from the ground up with virtually no outside assistance. According to Plaintiffs,

> "[Dianna] Larson was regularly and frequently exposed to asbestos in the construction of both homes as a result of sanding down the asbestos containing joint compound products manufactured and/or distributed by Defendants that Ms. Larson and her husband used to sheetrock the walls and ceilings, being in the sites where her husband was working with asbestos containing products, cleaning up the sites where asbestos containing products were used, and washing her and her husband's asbestos exposed clothes."

*Plaintiffs' Memorandum Of Law In Support Of Their Motion In Limine To Exclude Or Limit Dose Reconstruction Testimony Pursuant to Daubert and Rules 702 And 703 Of The Federal Rules Of Evidence* [Doc. 20-2] at p. 3.[3]

---

[2] This case was originally filed in 2007 in the District Court of Harris County Texas. It was voluntarily dismissed and in March 2008, Plaintiffs re-filed their case in the Third Judicial District Court, Salt Lake County, Utah. The action was then removed to the United States District Court, District of Utah and transferred to the MDL in June 2008. Fact-based and expert discovery has been completed in this forum. *Defendant Georgia-Pacific LLC's Memorandum To Exclude Testimony of Plaintiffs' Experts Under Rule Of Evidence 702 and Request for Hearing* [Doc. 19] at pp. 2-3.

[3] Hereinafter "Plaintiffs' Dose Reconstruction *Daubert* Motion."

Defendants dispute Dianna Larson's diagnosis[4] and further deny that her alleged exposure to chrysotile asbestos fibers contained in joint compound products caused or contributed to her mesothelioma. In the instant motions for summary judgment, the Defendants challenge product identification and causation.

## II. Legal Standards.

### A. Standard for Summary Judgment.

Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56( c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party has met its initial burden, the adverse party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." *Boykins v. Lucent Techs., Inc.*, 78 F.Supp.2d 402, 408 (E.D. Pa. 2000). The evidence presented must be viewed in the light

---

[4] The dispute centers on whether Dianna Larson has diffuse malignant mesothelioma of the peritoneum or well-differentiated papillary mesothelioma. According to Plaintiffs, Ms. Larson's treating pathologists "favor a diagnosis of malignant mesothelioma, specifically well differentiated epithelial mesothelioma." *Plaintiffs' Dose Reconstruction Daubert Motion* at p. 3 n.2. Defendants' expert, Gary R. Epler, opines that Dianna Larson's correct diagnosis is peritoneal well-differentiated papillary mesothelioma. *Expert Report of Gary R. Epler*, attached to Plaintiffs' Motion *In Limine* To Exclude Or Limit Testimony Pursuant To *Daubert* And Rules 702 And 703 Of The Federal Rules Of Evidence [Doc. 25-18] at p. 4.

most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir. 1983).

## B. Exposure and Causation Under Utah Law.

This case was originally filed in Utah state court and it is undisputed that Utah substantive law applies. *See Defendant Union Carbide's Motion for Summary Judgment* [Doc. 21-1] at pp. 4-5; *Defendant Bondex' Motion for Summary Judgment* [Doc. 22-1] at p. 3; *Defendant Georgia-Pacific's Product Identification Motion for Summary Judgment* [Doc. 17] at p. 10; and *Plaintiff's Memo In Opposition to Defendant Georgia-Pacific's Product Identification Motion for Summary Judgment* [Doc. 37] at p. 9.

Under the Utah Product Liability Act, a plaintiff must establish that "at the time the product was sold by the manufacturer or other initial seller, there was a defect or defective condition in the product which made the product unreasonably dangerous to the user or consumer." *Kleinert v. Kimball Elevator Co.*, 854 P.2d 1025, 1027 (Utah Ct. App. 1993)(citing Utah Code Ann. §78-15-6 (1977)).[5]

In order to survive a motion for summary judgment under Utah law, a plaintiff must show that there was a defect in the product, that the defect existed at the time the product was sold, and that the defect made the product unreasonably dangerous. *Id.*

The presence of sufficient evidence to survive a motion for summary judgment is, of course, a case-specific inquiry.

---

[5] In 2008, the Utah Legislature revised and recodified Title 78. Section 78-15-6 was renumbered Section 78B-6-703. *Egbert v. Nissan Motor Co., Ltd.*, 228 P.3d 737, 741.

In the present dispositive motions, two defendants challenge Plaintiff's product identification. Both argue that Plaintiff cannot show that she was exposed to a defective asbestos-containing product attributable to them.[6]

### III. DISCUSSION.

Viewing the evidence in the light most favorable to Plaintiff, and drawing every reasonable inference therefrom in her favor, I find that Ms. Larson has submitted sufficient evidence to raise a genuine issue of material fact as to causation.

At deposition, Ms. Larson testified that she and her ex-husband built two residences, the first beginning in 1973 and the second beginning in late 1977. *April 19, 2007 Deposition of Diana Larson* at pp. 26, 94.[7] During the construction of each of the two residences, Ms. Larson helped her ex-husband with the drywalling and specifically recalled using Bondex and Georgia-Pacific joint compound. *Id.* at pp. 33-34, 94, 104. According to Ms. Larson, they did not begin drywalling in the first house until the middle of 1974, and in the second house until sometime in 1978. *Id.* at pp. 90, 102.

---

[6] Defendant Union Carbide is sued as a "supplier defendant" for supplying asbestos fiber that was incorporated into other products, in this case as a supplier to Defendant Georgia-Pacific for use in its joint compound. In addition to joining in Georgia-Pacific's product identification challenge, Union Carbide presents a second argument. "Even assuming for the sake of argument that the Georgia-Pacific joint compound allegedly used on either of the homes contained asbestos, Georgia-Pacific had multiple suppliers of asbestos. Plaintiff, therefore, cannot establish that it is more likely than not that Ms. Larson was exposed to Union Carbide asbestos rather than some other suppliers' asbestos." *Union Carbide's Motion for Summary Judgment* [Doc. 21-1] at p. 2.

[7] Attached as Exhibit "1" of Plaintiff's Response to Georgia-Pacific's Motion for Summary Judgment on Product Identification [Doc. 47].

Ms. Larson testified that it was her job to sand down the joint compound after her ex-husband applied it to the sheetrock. *Id.* at p. 34. She described the process they used to apply joint compound to the sheetrock as follows:

> "[ . . . ] And then, there's, it's a piece of tape that comes in a large roll that is put on with, we used to call if mud, but I understand that it's called joint compound. You put it on and then the striping and then more on the top and then over all the nail holes to hold that, that board against the wall. It's kind of a thick board, I think, so - - [ . . . ]"

*Id.* at pp. 30.

Once the joint compound was dry, Ms. Larson would use sandpaper on it until the seam was "smooth and clean" and ready for painting. She testified that sanding was "dusty." She breathed in joint compound dust the entire time that she was sanding. *Id.* at pp. 33, 39-40. In addition, Ms. Larson was responsible for washing her work clothing as well as her ex-husband's clothing. She recalled shaking their work clothes before putting them in the washer and breathing in joint compound dust. Her ex-husband wore flannel shirts and Ms. Larson recalled lumps of joint compound sticking to his shirts which she would pick off with her fingers before washing them. *Id.* at pp. 47-48. She also helped with the clean up at the houses and recalled "dust in the air" while sweeping or using a shop vac. *Id.* at pp. 50-53.

Ms. Larson explained why she specifically recalled the brands "Bondex" and "Georgia-Pacific." As to Georgia-Pacific, she testified:

> "The Georgia-Pacific is maybe a little more romantic thing. I have never been out West before I came to marry my husband. But in Georgia there's a place called Jekyll Island, that's one of my favorite places. And while that sounds weird, this was our first home, what we had worked for for quite some time. And it was almost like bringing the South – because I got to go to the Pacific Ocean, which I had never done before. Like bringing the South – bringing the South and the West together, and I just remember looking at that and thinking isn't that neat, we have a company that has a base, I guess, in Georgia and one someplace in the

Pacific. And this is our home that we worked for and it's kind of bringing it together. It's just kind of a different way, but that's what I remember."

*Id.* at p. 35.

When asked about the containers of the joint compounds, Ms. Larson testified that both the Bondex and Georgia-Pacific joint compounds came in five gallon tubs with metal lids that were hard to pry off and metal handles. *Id.* at pp. 35-36. She recalled seeing the "tubs" at both residences; they used the same products during the construction of both houses. *Id.* at p. 105. Ms. Larson described the Georgia-Pacific container as follows:

> "QUESTION: And specifically the Georgia-Pacific joint compound, you mentioned that it came in a pail, or a bucket?
> ANSWER: Uh-huh, a bucket.
>
> QUESTION: And I think you mentioned –
> ANSWER: One of those five-gallon buckets.
>
> QUESTION: Was it always in a five-gallon bucket?
> ANSWER: That's all I remember. I'm supposed to tell you what I remember.
>
> QUESTION: Do you remember if it was a metal bucket or a plastic bucket?
> ANSWER: It was a plastic bucket. It had a metal handle. They were all plastic buckets.
>
> QUESTION: Can you describe for me what the packaging or the lettering on the bucket looked like?
> ANSWER: I only remember the names. Are you talking about Georgia-Pacific or Bondex?
> QUESTION: The Georgia-Pacific product.
> ANSWER: I don't remember like a hyphenated thing. I remember the writing out Georgia-Pacific. But that's why I remember that, because of the association that I made with it.
>
> QUESTION: Do you recall any instructions on the bucket of the Georgia-Pacific product?
> ANSWER: No, I don't.

> QUESTION: Did you ever – Do you remember ever picking up a bucket to read anything on the bucket?
> ANSWER: I remember picking up the buckets and how heavy they were. We used to use them and put a plank of wood between them to sit on sometimes, for like a bench, but I don't remember.
>
> QUESTION: Do you ever personally recall looking at any of the writing on the bucket?
> ANSWER: Just the name. That's all remember.
>
> QUESTION: And I know you told us that you can't recall seeing a warning. Did you ever look for a warning on the bucket of Georgia-Pacific compound?
> ANSWER: No. I didn't know that there was such a thing. [ . . . ]
>
> QUESTION: Do you remember what the Georgia-Pacific product was actually called that was in the bucket?
> ANSWER: We called it mud.
>
> QUESTION: You don't remember a specific trade name that went along with it?
> ANSWER: I don't."

*Id.* at pp. 95-98.[8] When specifically asked whether the Georgia-Pacific joint compound was "always in a five-gallon bucket," Ms. Larson responded: "That's all I remember. I'm supposed to tell you what I remember." *Id.* at p. 95.[9]

In its motion for summary judgment, Georgia-Pacific asserts that Ms. Larson "cannot carry her burden to prove that a Georgia-Pacific product caused her alleged asbestos-related injuries and Georgia-Pacific is entitled to judgment as a matter of law." *Georgia-Pacific's Motion for Summary Judgment on Product Identification* [Doc. 17] at p. 6. This

---

[8] Throughout her testimony, Ms. Larson was consistent in her recollection that the joint compound came in buckets/tubs. *See id.* at pp. 50, 105, 116-117, 118.

[9] Ms. Larson testified that her ex-husband purchased all of the building materials. *Id.* at p. 98.

Defendant argues:

> "As to Georgia-Pacific, the only 'asbestos-containing' product to which Mrs. Larson alleges she was exposed was a mud-like joint compound packages in *plastic* buckets. As demonstrated in the attached affidavit from Howard A. Schutte, however, no such Georgia-Pacific asbestos-containing product ever existed. Indeed, the undisputed evidence shows that the only Georgia-Pacific mud-like joint compound product which was packaged in a *plastic* bucket (as opposed to a metal one) was not placed on the market until 1978 - after the time Georgia-Pacific had already removed asbestos as a constituent ingredient and could not, therefore, have caused her any asbestos related injuries."

*Id.*

In support of its motion for summary judgment, Georgia-Pacific cites to the affidavit of Howard A. Schutte, a former employee of Georgia-Pacific who last held the position of "Vice President - Strategy and New Product Development, Georgia-Pacific LLC." *Schutte Affidavit*, attached as Exhibit B to Georgia Pacific's Motion for Summary Judgment [Doc. 17-1]. In his affidavit, Mr. Schutte states that: (1) Georgia-Pacific stopped manufacturing the last of its asbestos-containing joint systems products "no later than May 4, 1977;" (2) Georgia-Pacific Ready Mix is the only paste joint systems product which came packaged in pails or buckets; and (3) Georgia-Pacific's Ready Mix was first packaged in plastic pails or buckets beginning in 1978, after asbestos was removed from the Ready Mix product. *Id.* at ¶¶ 4, 6, 7.

In response to Georgia-Pacific's motion for summary judgment, Plaintiffs cite to the deposition testimony of several Georgia-Pacific representatives:

> (1) The deposition of Mr. Schutte, given on June 22, 2007, in which he stated that Georgia-Pacific sold joint compound products in Utah from 1972 through 1977;
> (2) the deposition testimony of Oliver E. Burch in which he testified that approximately 74% of the joint compound shipped from Georgia-Pacific plants in the first quarter of 1977 contained asbestos;
> (3) The deposition testimony of C. William Lehnert, given on October 3, 2001, in which he stated that Georgia-Pacific's Ready Mix joint compound manufactured at the Texas plant between September 22, 1971 and May 4, 1977 contained

asbestos, and he testified that the Ready Mix line came in a metal pail or a plastic pail; and

(4) the deposition testimony of Mr. Lehnert, given September 20, 2006, in which he testified that a decision was made to target the Ready Mix Joint Compound as the last product from which to remove asbestos because "there was only one opportunity for the asbestos in the product to be breathed, and that was when it was sanded [. . . ]," he stated that by 1977, Georgia-Pacific was "still working on the removal project removing asbestos from Ready Mix," and he confirmed that Ready Mix containing asbestos came in both metal and plastic pails, with the plastic containers being used later but he didn't remember the date they were first used.

*Exhibits to Plaintiffs' Response to Georgia Pacific's Motion for Summary Judgment* [Doc. 47] at Exhibit 2 (Schutte Deposition) at p. 46, Exhibit 3 (November 17, 2005 Burch Deposition) at p. 213, Exhibit 4 (Lehnert October 3, 2001 Deposition) at pp. 44, 51, and Exhibit 6 (September 20, 2006 Lehnert Deposition) at pp. 57, 82, 181-82, and 185-86.

Additional evidence is submitted by Georgia-Pacific in its reply brief. There is a later affidavit of Howard A. Schutte in which he explains inconsistencies in his prior testimony as follows:

> "I have previously testified, based solely on my memory of events that occurred over thirty years ago, as to the time period that Georgia-Pacific first packaged Ready Mix in plastic buckets. Without reviewing any documents or otherwise refreshing my recollection prior to such testimony, my initial recollection was that Georgia-Pacific began transitioning to plastic buckets during the time that Georgia-Pacific was manufacturing asbestos-containing Ready Mix. However, as the timing of this transition has begun to frequently come into question, I have now reviewed documentation of Georgia-Pacific's packaging brochures and product packaging photographs, as well as other historical documentation, including Sweets Catalogs, Georgia-Pacific Technical Reports and Georgia-Pacific memoranda, to determine when Georgia-Pacific's Ready Mix was packaged in metal cans and plastic buckets. All of this data indicates that during the time Georgia-Pacific manufactured asbestos-containing Ready Mix, Ready Mix was packaged in metal cans. I saw no data indicating that Georgia-Pacific's asbestos-containing Ready Mix was ever packaged in plastic buckets. In fact, the data indicates that Georgia-Pacific Ready Mix was first packaged in plastic buckets beginning in 1978. Thus, after this further inquiry and

examination of historical records, I have concluded that Georgia-Pacific Ready
Mix was first packaged in plastic buckets beginning after asbestos was removed
from the Ready Mix."

*Second Schutte Affidavit*, attached as Exhibit A to Georgia Pacific's Reply [Doc. 51-1] at ¶¶ 4, 5.

There is also a more recent affidavit of Mr. Lehnert in which he similarly explains prior inconsistencies in his testimony:

"I have previously testified, based solely on my memory of events that occurred over 30 years ago, as to the time period that Georgia-Pacific first packaged Ready Mix in plastic buckets. Without reviewing any historical documents, such as Georgia-Pacific product packaging brochures and product packaging photographs, Sweets Catalogs, Georgia-Pacific Technical Reports and Georgia-Pacific memoranda, or otherwise refreshing my recollection prior to such testimony, my initial recollection, although I was uncertain, was that Georgia-Pacific began transitioning to plastic buckets during the time that Georgia-Pacific was manufacturing asbestos-containing Ready Mix.
However, I have reviewed the January 7, 2010 affidavit of Mr. Howard Schutte, who was employed by Georgia-Pacific from 1973-2008 and last held the position of President - Strategy and New Product Development, Georgia-Pacific Gypsum LLC. As indicated in his affidavit, he has reviewed Georgia Pacific memoranda, and concluded that Georgia-Pacific Ready Mix was first packaged in plastic buckets after asbestos was removed from Ready Mix.
Based on this, I believe that my initial recollection, uncertain at the time, was in fact incorrect and Mr. Schutte's conclusion based on his further inquiry and examination of the above-described materials is accurate."

*Charles W. Lehnert Affidavit*, attached as Exhibit B to Georgia Pacific's Reply [Doc. 51-2] at ¶¶ 5-7.[10]

---

[10] On December 6, 2010, Georgia-Pacific filed an "Amended Memorandum of Law in Support of Its Amended Motion for Summary Judgment on Product Identification." *See Doc. 87.* According to Georgia-Pacific, the amendment "is based on the further review and analysis of information by affiant Howard A. Schulte [sic]." This filing will be stricken as untimely.

Having reviewed the motions and exhibits, and viewing the evidence in the light most favorable to Plaintiffs, I find that the evidence submitted is sufficient to raise a genuine issue of material fact as to causation. Defendant Georgia-Pacific manufactured and sold asbestos-containing joint compound during the period in which Ms. Larson alleges exposure while she participated in the construction of the first residence. In addition, Ms. Larson has a specific recollection of using the Georgia-Pacific joint compound because of a personal association with the name. Her testimony that the joint compound came in five gallon plastic buckets with a metal lid does not, as Georgia-Pacific argues, establish that "the Georgia-Pacific product described by Mrs. Larson was not in existence during the time period she claims." *See Georgia-Pacific's Motion for Summary Judgment on Product Identification* at p. 2. There is evidence of record which suggests that plastic containers were used by Georgia-Pacific during the relevant time. It is up to the jury to decide whether Ms. Larson was mistaken about the material which the five gallon bucket was made of, and what weight, if any, this has on her testimony, as well as to weight to assign the testimony of various corporate representatives in light of internal inconsistencies in their statements. *See Kleinert v. Kimball Elevator Co.,* 854 P.2d at p. 1027 ("The appellant need not prove his or her case before the case may be submitted to the jury. The appellant need only submit evidence sufficient to raise a genuine issue of material fact. [citations to caselaw omitted]").[11]

---

[11] As noted above, I have declined to address Georgia-Pacific's untimely amended memorandum. However, I note (for the sake of completion of the record) that assuming *arguendo* that the latest affidavit of Howard A. Schutte were considered, it would not change my decision that summary judgment on product identification is not warranted under the present circumstances.

In addition to joining in Georgia-Pacific's arguments as to product identification, Union Carbide contends that it is entitled for summary judgment because:

> "Even assuming for the sake of argument that the Georgia Pacific joint compound allegedly used on either of the homes contained asbestos, Georgia Pacific had multiple suppliers of asbestos. Plaintiff, therefore, cannot establish that it is more likely than not that Ms. Larson was exposed to Union Carbide asbestos rather than some other suppliers' asbestos."

*Union Carbide's Motion for Summary Judgment and Joinder in Georgia-Pacific's Motion for Summary Judgment* [Doc. 21-1] at p. 2.

There is evidence, in the form of deposition testimony of Mr. Lehnert in which he testified that the Ready Mix joint compound manufactured by Georgia-Pacific at the Acme, Texas plant contained asbestos supplied by Union Carbide. *See Exhibits to Plaintiffs' Response to Union Carbide's Motion for Summary Judgment* [Doc. 46] at Exhibit 4 (October 3, 2001 Lehnert Deposition) at p. 51 and Exhibit 6 (September 20, 2006 Lehnert Deposition) at p.181. Union Carbide argues that there is evidence that Georgia-Pacific used additional asbestos suppliers in manufacturing its joint compound, and therefore, "Plaintiffs cannot establish that it is more likely than not that Ms. Larson was exposed to Union Carbide asbestos rather than some other suppliers' asbestos." *Union Carbide's Motion for Summary Judgment* at p. 8. At the summary judgment stage, Plaintiff has submitted sufficient evidence to raise a genuine issue of material fact as to whether she was exposed to Georgia-Pacific joint compound containing asbestos supplied by Union Carbide. This is enough to meet her burden at this point in the process.

## IV. CONCLUSION.

I conclude that there is sufficient evidence to raise a genuine issue of material fact regarding causation as to both Georgia-Pacific and Union Carbide and, therefore, summary judgment on product identification as to these Defendants is not warranted.

BY THE COURT:

M. FAITH ANGELL
UNITED STATES MAGISTRATE JUDGE